**GREENBUSH STATE BANK, Appellant,**

v.

**Larry STEPHENS, Respondent.**

**No. C7–90–532.**

Court of Appeals of Minnesota.

Nov. 27, 1990.

Review Denied Feb. 4, 1991.

Douglas W. Hughes, Patrick D. Moren Law Offices, Roseau, for appellant.

Steven A. Anderson, Hardwick & Mergens, P.A., Warroad, for respondent.

Considered and decided by DAVIES, P.J., and LANSING and THOREEN, JJ.*

## OPINION

DAVIES, Judge.

Appellant Greenbush State Bank foreclosed a perfected security interest in David Stauffenecker's agricultural equipment. The bank attempted to seize a John Deere 4020 tractor located on respondent Larry Stephens' farm, alleging it belonged to Stauffenecker. When Stephens refused to tender the tractor, claiming he owned it, the bank sued. The trial court ruled that Stephens owned the tractor free and clear of any interest of the bank. We reverse.

## FACTS

In June 1984 Greenbush State Bank entered an agreement with turkey farmer David Stauffenecker under which Stauffenecker granted the bank a security interest in all livestock, farm machinery, and equipment "now owned or hereafter acquired." A corresponding financing statement was filed June 19, 1984. The equipment covered by the agreement included an Oliver 880 tractor.

Stauffenecker was dissatisfied with the Oliver, but Vernon Waage owned a John Deere 4020 tractor which Stauffenecker believed could be used both in his turkey and in Stephens' cattle operations. During late summer and early fall 1986, Stauffenecker negotiated with Waage, Stephens, and the bank to arrange the following:

(1) the bank would release its security interest in the Oliver tractor;

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

(2) Stauffenecker would trade the Oliver tractor and $4,500 "to boot" to Waage for the John Deere tractor;

(3) Stephens would provide money as part of a trade for the John Deere; and

(4) Stephens and Stauffenecker would then both use the John Deere in their respective farm operations.

The exact sequence of Stauffenecker's negotiations is not clear on the record.

On August 19, 1986, Stephens' wife wrote a check to Stauffenecker for $5,200 which included the words "for tractor" in its memo blank. The testimony indicates that although the check was for $5,200 and was labeled "for tractor," it included $700 to be used for something other than the tractor deal. The bank's loan officer testified that the bank had no communication with Stephens before it released its security interest in the Oliver tractor in September or October 1986 for the trade. The loan officer testified that he believed the bank was gaining the John Deere tractor as replacement collateral for the Oliver.

Stauffenecker testified that the trade was completed in late September 1986 and that the "to boot" money came from his turkey farming operation. He further stated that while he borrowed money from Stephens, "that was for feed and stuff." Stauffenecker also testified that Stephens got a mortgage on Stauffenecker's equipment second to the bank's.

Stephens testified, however, that he provided Stauffenecker the "to boot" money with the understanding that he (Stephens) would own the tractor "until he (Stauffenecker) paid for it. That way if it was mine, I didn't have to go through the hassle of mortgages and security agreements and whatnot." Stephens additionally testified that they agreed Stauffenecker would be able to use the tractor off and on until Stauffenecker paid $4,500 for it.

Stauffenecker and Stephens shared use and possession of the tractor after the trade and at first, even during the winter while the tractor was used primarily on Stephens' farm, it was stored off Stephens'

farm in a neighboring farmer's machine shop.

Stephens testified that he mortgaged the tractor to the Badger State Bank in 1987, paid off the mortgage, and subsequently remortgaged the tractor to the same bank a year later and still owed money to the Badger State Bank on that mortgage.

Upon Stauffenecker's default on appellant bank's secured loan, the bank sold Stauffenecker's equipment and, alleging that Stauffenecker owned the tractor, attempted to sell it pursuant to the after-acquired property clause in the security agreement. At that time, however, the tractor was on Stephens' farm and Stephens, claiming ownership, refused to let the tractor be sold. The bank sued Stephens, claiming he did not own the tractor because it was "proceeds" of the Oliver, which was secured.

Adopting Stephens' explanation of both the "to boot" money and the legal effect of the agreement underlying the Stauffenecker–Waage trade, the trial court held that Stephens owned the tractor. For this reason the trial court concluded that Stauffenecker did not receive any proceeds of the Oliver tractor and the bank's security interest could not attach to the John Deere. The bank challenges the trial court's conclusion that Stephens owns the John Deere.

## ISSUES

1. Did the trial court err in ruling that Stephens owns the John Deere tractor?

2. Does Stephens' interest in the tractor defeat the bank's security interest?

## ANALYSIS

### Standard of Review

Generally,

> The scope of review in a case tried by the court without a jury is limited to determining whether the court's findings are clearly erroneous and whether it erred in its conclusions of law.

*Lake Mille Lacs Investment, Inc. v. Payne,* 401 N.W.2d 387, 389 (Minn.App. 1987), *pet. for rev. denied* (Minn. April 29,

1987) (citing *Leininger v. Anderson*, 255 N.W.2d 22, 26–27 (Minn.1977)).

## I.

The trial court, in a bench trial, held that Stephens was the "owner" of the tractor and did not have to protect his rights by filing a security interest. We decide that legal conclusion is not consistent with the undisputed evidence.

The uncontradicted evidence, including Stephens' account of the transaction, established that Stauffenecker would "own" the $8,500 tractor if he paid $4,500, a fact wholly inconsistent with exclusive ownership resting in Stephens. It was Stephens' testimony that Stauffenecker contributed the value of the Oliver to the purchase of the John Deere, a fact inconsistent with Stephens having exclusive ownership of the John Deere. It is also uncontradicted that Stauffenecker and Stephens planned to (and did) share use of the tractor until Stauffenecker paid the $4,500, another fact inconsistent with Stauffenecker not holding an ownership interest.

Stephens testified that his ownership arrangement was prompted by his desire to avoid the "hassle of mortgages and security agreements and whatnot." Whatever inconveniences Article 9 of the Uniform Commercial Code imposes cannot be avoided by simply claiming ownership. The claim does not change the reality.

Stephens' attempt to support his ownership claim by evidence of his twice mortgaging the tractor to the Badger State Bank does not affect the interest actually held by Stauffenecker.

Of course "ownership" under the UCC can be shared, with each party possessing its own bundle of interests. Here Stauffenecker negotiated for the tractor and bought it from Waage, paying for it with his Oliver and with $4,500 that Stephens advanced to him. That advance of purchase money allowed Stauffenecker to obtain the John Deere. The UCC contemplates such transactions and gives to those who advance purchase money (Stephens) a "purchase money security interest."

Minnesota Statutes, section 336.9–107 (1988), provides:

> A security interest is a 'purchase money security interest' to the extent that it is
>
> \* \* \* \* \* \*
>
> (b) taken by a person who by making advances \* \* \* gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used.

Under UCC provisions Stephens would have an interest in the John Deere tractor through the $4,500 used as purchase money. Relying on the facts presented either by Stauffenecker or by Stephens, it was error for the trial court to declare Stephens the sole owner of the tractor. Under the evidence presented, Stephens held a purchase money security interest, and no more, for Stauffenecker clearly held some ownership interest.

## II.

This case was tried below on a theory that the John Deere might be the "proceeds" of the Oliver and that the appellant's security interest followed from the Oliver to the John Deere. This method of tracing ownership is unnecessary, for if Stauffenecker had an ownership interest in the John Deere, the bank's security interest attached to it through the after-acquired property clause. Under any reading of the facts, Stauffenecker had an ownership interest. Therefore, the bank's security interest attached.[1]

---

1. To the extent that it may be argued that our decision is inappropriate because it is based on a theory not presented to the trial court, we disagree. Initially our review of legal issues is de novo. *Frost–Benco Electric Ass'n v. Minnesota Public Utilities Comm'n,* 358 N.W.2d 639, 642 (Minn.1984); *see Leininger,* 255 N.W.2d at 26–27; *Payne,* 401 N.W.2d at 389. Further, the supreme court has made clear an appellate court's obligation to decide cases in a manner consistent with existing law when there is nothing "novel or questionable" about the relevant law. *See State v. Hannuksela,* 452 N.W.2d 668, 673 n. 7 (Minn.1990). We perceive nothing "novel or questionable" about our application of Article 9.

## III.

The issue then becomes one of priority between the security interests of the bank and of Stephens. Relevant UCC rules of priority state:

(5) In all cases not governed by other rules stated in [Section 336.9–312] (including cases of purchase money security interests which do not qualify for the special priorities set forth in subsections (3) and (4) of this section), priority between conflicting security interests in the same collateral shall be determined according to the following rules:

(a) Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.

\* \* \* \* \* \*

(6) For the purposes of subsection (5) a date of filing or perfection as to collateral is also a date of filing or perfection as to proceeds.

Minn.Stat. §§ 336.9–312(5), (6). *See also* UCC § 9–312 comment 4.

Generally a security interest is perfected by filing a financing statement. *See* Minn. Stat. §§ 336.9–401–402. Here the trial court found that the bank filed its original financing statement, with its after-acquired property clause, on or about June 19, 1984. There was no post-exchange period when the bank did not have a perfected interest in Stauffenecker's equipment. That equipment included the John Deere tractor as soon as it was acquired. Thus, the bank's interest therein was immediately perfected. Even so, a purchase money security interest could defeat the bank's security interest under the code had it been perfected.

A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral or its proceeds *if the purchase money security interest is perfected* at the time the debtor receives

possession of the collateral or within 20 days thereafter.

(Emphasis added.) Minn.Stat. § 336.9–312(4) (1988). Thus, in order to retain the benefit of his purchase money security interest against the claim of another secured party, Stephens had to perfect within 20 days. Stephens, however, did not file within 20 days. Having failed to file, he loses to the Bank's perfected interest.

This conclusion is consistent with existing case law. In *Borg Warner Acceptance Corp. v. ITT Diversified Credit Corp.*, 344 N.W.2d 841 (Minn.1984), a creditor filed a financing statement regarding a debtor's inventory. Subsequently, a second creditor made a purchase money loan to the debtor and requested from the Secretary of State a list of the debtor's creditors so that the second creditor could obtain priority over other creditors by notifying them of its purchase money security interest in the inventory. (Notice is required as to inventory.) *See* Minn.Stat. § 336.9–312(3)(b) (1988). The Secretary of State failed to inform the second creditor of the first creditor. The second creditor complied with all requirements of the code, other than informing the first creditor about the purchase money security interest in the debtor's inventory. In the subsequent suit between the creditors, the trial court ruled that because the second creditor's failure to comply with the notice requirement was the Secretary of State's fault, rather than that of the second creditor, equity required the second creditor's interest to have priority over the first creditor's. The supreme court reversed, stating that:

[P]lacing the risk of mistakes by the filing officer on the later party to file in this situation is in accordance with the purpose of the Article 9 filing system.

*Borg Warner*, 344 N.W.2d at 843. The second creditor in *Borg Warner* had a stronger equitable claim to priority of interest than does Stephens, who did not even attempt to comply with Article 9.

## IV.

Although Stephens made no filing to preserve rights in the tractor, he did ultimately obtain possession of the tractor.

Under certain circumstances a "security interest in * * * goods * * * may be perfected by the secured party's taking possession of the collateral." Minn.Stat. § 336.9–305 (1988). Under Article 9, "goods" includes farm equipment. *See* Minn.Stat. § 336.9–109(2) (1988). *See also* Minn.Stat. § 336.9–105(1)(h) (1988).

If Stephens had perfected his interest in the tractor by taking unequivocal, absolute, and notorious possession [within 20 days] he would have had priority under Minn. Stat. § 336.9–312(4) to the extent of the money advanced. Stephens testified:

> [The tractor has been on my farm] * * * for the last 14, 15 months * * * and prior to that time it was there *most of the time.*

(Emphasis added.) Fifteen months prior to December 1989 is September 1988. That is two years after Stauffenecker completed the tractor exchange in late September 1986. Even assuming that the tractor was on Stephens' farm "most of the time" starting within the statutory 20–day period, we cannot say that "most of the time" is sufficient to meet the possession requirements of Article 9. *See Hutchison v. C.I.T. Corp.*, 726 F.2d 300, 302 (6th Cir.1984) ("in order to effect perfection, possession must be *'unequivocal, absolute, and notorious,* so that third parties may be advised.' ") (quoting *Transport Equipment Co. v. Guaranty State Bank,* 518 F.2d 377, 381 (10th Cir.1975) (other citation omitted) (emphasis added)). Finally we note that while the code provides for perfection by possession, such perfection generally "continues only so long as possession is retained * * *." Minn.Stat. § 336.9–305.

Because Stephens did not perfect his interest in the tractor by filing within 20 days *or by possession,* he does not gain priority under Minn.Stat. § 336.9–312(4).[2]

## DECISION

The trial court erred in concluding that Stephens' interest in the tractor was not subject in its entirety to the security interest of the bank.

Reversed.

---

2. One could argue that apportionment of interests in the John Deere 4020 tractor may be appropriate. *See International Harvester Credit Corp. v. American National Bank of Jacksonville,* 296 So.2d 32 (Fla.1974). We disagree and note that the apportionment holding of *International Harvester* was explicitly overruled by the Florida legislature. *See* 1978 Fla.Laws ch. 78–222 *codified at* Fla.Stat. § 679.312 (1978) and preamble thereto (specifically disapproving of *International Harvester*); *see also Matter of Outrigger Club, Inc.,* 6 B.R. 78, 81 (1980).